LANIER, Judge.
This action is a suit for worker’s compensation benefits, medical expenses and statutory penalties. The trial court found the employee failed to prove her claims by a preponderance of the evidence and rendered judgment in favor of the employer. The employee took this devolutive appeal. While this appeal was pending, the employee filed a motion with this court requesting this action be remanded to the trial court for the introduction of additional evidence.
FACTS
Patricia Batiste commenced working for Our Lady of the Lake Regional Medical Center (OLOL) in Baton Rouge, Louisiana, on November 15, 1982. She was assigned duties as a nurse’s aide and was paid $4.89 per hour for a 40 hour week.
On April 11, 1985, Batiste was washing a patient’s hair at OLOL when she tripped on an electrical cord and fell. She continued to work after this incident. The next morning she woke up with neck pains and a headache. She went to a chiropractor on April 15, 1985, for treatment. This treatment did not alleviate her symptoms, and she stopped working. Effective May 6, 1985, she started receiving worker’s compensation benefit payments.
On May 9, 1985, Batiste consulted Dr. J. Thomas Kilroy, an orthopedic surgeon. She gave Dr. Kilroy the history of the accident and complained of pain in her neck and right shoulder and headaches. She did not give a history of or complain of back pain at this time. Dr. Kilroy diagnosed Batiste’s injury as a cervical strain. He prescribed physical therapy and medication. Dr. Kilroy saw Batiste again on May 16, 1985. She was doing better but still had *1340 neck pain. On May 22, 1985, Dr. Kilroy referred Batiste to Dr. Michael P. Dulligan, a neurological surgeon.
Batiste saw Dr. Dulligan on May 23, 1985. She gave a history of the accident with subsequent pain in the neck and between the shoulder blades. She did not give a history of or complain about back pain. Dr. Dulligan gave Batiste a neurological examination and diagnosed her condition as a cervical myofasciitis syndrome incurred by a flexion/extension injury to the neck. Dr. Dulligan defined a myofasci-itis as an inflamation of the ligamentous attachment of the muscle. Dr. Dulligan recommended that Batiste continue in physical therapy, and he prescribed muscle relaxers for her. Dr. Dulligan saw Batiste again on June 6, 1985, and had her admitted to OLOL on June 7 for a myelogram. The myelogram revealed no cervical defects and a mild ventral bulge in the disc at the L-5, S-l level. Batiste was discharged from OLOL on June 9, 1985. Her discharge summary shows a diagnosis of cervical myofasciitis, lumbar myofasciitis and lumbar disc degenerative disease. Dr. Dul-ligan saw Batiste again on June 14, 1985, and advised her that she had a normal cervical myelogram and “a bulge at L-5, S-l, that is, the lumbar region, but I did not feel that this was symptomatic and I did not offer any treatment of that.” Dr. Dulligan saw Batiste again on July 2, 1985, and she still complained of pain in her neck.
Because Batiste continued to complain of pain, Dr. Kilroy referred her to Dr. Robert E. Hanchey, a neurosurgeon, for a second opinion. Dr. Hanchey saw Batiste on July 17 and August 14, 1985. Batiste gave a history of the accident and complained of pain in her neck and back. Dr. Hanchey did a neurological examination of Batiste’s neck and back. In his deposition, Dr. Han-chey gave the following testimony about Batiste’s medical condition:
Q. Were all your tests normal?
A. Her neurologic examination of her neck and of her lower back were normal. Following that I reviewed some x-rays which included several cervical spine series as well as the lumbar spine series as well as a cervical myelo-gram. These studies were normal. There was noted a lateral view of the lumbar spine on the myelogram which was present, which showed a bulge — a mild bulge at L-5,- S-l, a cervical CT, which was normal. My impression was that she had a normal cervical and lumbar exam. I commented with regard to that examination by stating, “It is my impression that Ms. Batiste has overreacted to her injury and at this time her symptoms are not on a sound physiologic basis.” I informed her of this and pointed out that therapy and time had failed to relieve her subjective symptoms. She has no findings. I discussed this with Dr. Kilroy, whose findings were similar to mine. It was my strong recommendation that she return to work immediately without restrictions. I told her that I felt that she could attempt to minimize her discomfort, that I did not think she had suffered a significant injury and felt that it was in her best interest to return to work. She reiterated on several occasions during this discussion that she truly hurt, indicating somewhat of a denial pattern consistent with non-physiologic symptomatology. I summarized by saying, “Basically, I think that she is suffering from a mild traumatic conversion reaction, one that is not uncommon in this situation. She has been told by several physicians that she has been truly injured and is beginning to believe this. She does not have a significant neuromuscular problem, either radiographically or from an objective neuromuscular standpoint.”
Dr. Hanchey released Batiste to return to work on July 17, 1985, and her compensation benefits were terminated effective that date. Dr. Hanchey was of the opinion that the bulging disc at the L-5, S-l level was “degenerative in nature — acquired in nature and not acquired from this injury.”
*1341 Apparently, Batiste returned to work at OLOL. She saw Dr. Dulligan on October 28, 1985, and complained of low back pain. She saw Dr. Dulligan again on December 12, 1985, and complained of neck pain. Dr. Dulligan referred Batiste to Dr. Richard Gold, a neurologist.
Dr. Gold saw Batiste for the first time on December 19, 1985. Batiste gave Dr. Gold a history ,of the accident and pain in her neck and shoulders developing two days later. Dr. Gold did an EMG on Batiste on December 27, 1985, which was negative for the lower extremities. Batiste stopped working at OLOL on December 19, 1985, and her compensation benefit payments were reinstituted as of December 20, 1985. Batiste saw Dr. Gold again on January 6 and 8 and February 17, 1986. During the period of March 6 through 20,1986, Batiste was admitted to OLOL for extensive diagnostic testing. Her discharge summary, prepared by Dr. Dulligan, is as follows:
This lady had a Gallium scan done which was negative. She had thoracic CAT scan done which was negative. She had chest film made which was negative. Hemoglobin was 12.4, hematocrit 35.9, white cell count 4,700. Her Sed. rate was elevated in the 80’s. Dr. Anderson Linton and Dr. Richard Gold worked her up for this. Thyroid studies were normal. ANA test was normal. Negative rheumatoid factor, negative CEA, plasma test negative. Negative glucose tolerance test. She had a negative RPR for syphilis. Negative urinalysis, negative intravenous pyelogram. Negative antinuclear antibodies. Negative C. reactive protein. Negative protein electrophoresis. Basically no etiology was discovered for the multiple aches and pains that she has. At least, she is going to be followed by Dr. Gold in the clinic. There is no definitive diagnosis. She is being discharged. We know there is chronic lumbar myofasciitis.
Dr. Gold testified by deposition that Batiste’s only objective symptoms were stiffness in her neck, tightness in the nerves in the back of her head and depression. He felt she had no work limitations for physical reasons, but she needed to go to a pain clinic and be detoxified because she was taking so much pain medicine.
On March 21, 1986, Batiste saw Dr. Anthony Ioppolo, a neurosurgeon. Batiste gave a history of the accident and complained of back, neck and shoulder pain. Dr. Ioppolo performed a neurological examination on Batiste and saw her again on April 7, 15 and 22, 1986. Dr. Iopollo found no objective symptoms, and all diagnostic tests were negative. Dr. Ioppolo was of the opinion that there was no pathological reason why Batiste could not return to work. He felt the bulging disc was not significant. He also felt Batiste needed a neuropsychological evaluation for her chronic pain syndrome and referred her to Dr. John C. Grabert, a clinical psychologist.
Dr. Grabert saw Batiste on March 24 and April 16, 1986. Batiste was extremely upset and angry about her medical situation. Dr. Grabert determined that Batiste was not psychotic or out of control but did have a personality disorder that resulted in maladaptive behavior. Dr. Grabert was of the opinion that his services would not be useful to Batiste.
Batiste’s employment with OLOL was terminated on April 18, 1986. Batiste’s compensation benefits were terminated on May 16, 1986. During the period of May 6, 1985, through May 16, 1986, Batiste was paid compensation benefits for 31 weeks and 3 days in the amount of $4,030 and had medical benefits of $15,406 paid for her.
On May 6,1986, Batiste pled guilty in the Nineteenth Judicial District Court to theft by fraud and misrepresentation of $2,991 in food stamps during the period of November 1980 through July of 1983. She was sentenced to serve one year in the parish jail, which sentence was suspended, and she was placed on active probation for three years with numerous conditions of *1342 probation.[1]
This suit was filed on September 8, 1986.
Batiste consulted Dr. Thomas S. Whitec-loud, III, an orthopedic surgeon, on September 12 and 16,1986. Dr. Gold made the referral. Batiste gave a history of the accident and complained of low lumbar pain. Dr. Whitecloud examined her, and she was tender to palpation in the mid-cervical segments. On February 20, 1987, Dr. Whitecloud performed a magnetic resonance test (MRI) -on Batiste. This test showed the cervical spine was normal and there was an annular bulge at the L-5, S-l disc level which Dr. Whitecloud felt was “significant clinically, although the radiologist who sent the report didn’t feel it was.” Dr. Whitecloud saw Batiste again on May 29, 1987, and had a lumbar discography performed on her. In a discography, a needle is inserted into a disc and a dye is injected. The injection is to see if the dye will reproduce the patient’s pain (and confirm the disc as the site of the patient’s problem) and see if the dye escapes from the disc (and confirm that the disc is abnormal). In the discography on Batiste, the dye ran out through tears in the annulation at the L-5, S-l level. Dr. Whitecloud diagnosed this condition as an internal disc derangement. The disc was not out of place or ruptured, but it was abnormal on the inside. This condition disabled Batiste from working as a nurse’s aide. However, she could do “sedentary work activities” or light work. This condition was caused by Batiste’s accident at OLOL and was not caused by degenerative disease. Dr. Whi-tecloud opined that this condition could not be properly diagnosed until a discography was performed, although he acknowledged that a discography was a “controversial diagnostic test.” He felt Batiste “would probably benefit from surgical intervention”, that the pertinent operation had a 70% success rate, and that the period of recovery from the surgery was one year.[2]
On June 15, 1987, Batiste saw Dr. Dulli-gan again. She complained of severe low back pain. Dr. Dulligan had Batiste admitted to OLOL for the period of June 15-23, 1987. His discharge summary for this hospitalization states as follows:
This is a 34 year old black lady with severe low back pain which I’m calling lumbar myofascitis [sic]. She also has some degenerative disc changes there. She came into the emergency room with severe low back pain. I admitted her and we used physical therapy. She is much better at this time and she is being discharged. She is Dr. Thomas Whitec-loud’s patient out of New Orleans. Dr. Whitecloud has offered his surgery to her and I am discharging her to his care. Discharge diagnosis: Lumbar myofasci-tis [sic] with degenerative disc disease.
OLOL’S LIABILITY FOR COMPENSATION
Batiste contends “the trial court erred in finding for the defendant, that the evidence supported their position that appellant was no longer injured, as well as dismissing appellants [sic] case where only one doctor’s findings supported appellants [sic] allegation of an injury, as opposed to numerous other doctors who could not diagnosis her problem.”
The trial court judge gave the following oral reasons for judgment:
The depositions of Doctors Kilroy, Dulli-gan, Ioppolo, Gold, Hanchey and Grabert leave the court with the inescapable conclusion that the plaintiff originally suffered, at most, from a job related cervical or lumbar strain and from which she recovered. This finding is made notwithstanding the deposition of Dr. Whi- *1343 tecloud and his findings somewhat to the contrary. This is particularly true since Dr. Whitecloud’s opinion is based upon diskography [sic] which he admits to be a conroversial [sic] diagnostic test but, more importantly, that the diskography [sic] didn’t tell him anything that the myelogram, CT scan and other diagnostic tests performed by her Baton Rouge physicians had told them.
A fair reading of all of the medical data leaves the plaintiff deficient of the necessary proof to sustain her claim and, accordingly, the plaintiff’s claim for further compensation is denied and the case is dismissed at her costs.
[Emphasis added.]
After a thorough review and evaluation of the record that was before the trial court, we conclude that the trial court’s factual findings are not clearly wrong.
This assignment of error is without merit.
REMAND
The trial of this case was held on February 19, 1988. Judgment was rendered in accordance with the oral reasons on February 24, 1988. Batiste’s trial counsel obtained an order for a devolutive appeal on March 9, 1988. Batiste’s brief was filed in this court on June 24, 1988. OLOL’s brief was filed on August 11, 1988. On February 24, 1989, a new attorney was enrolled as additional counsel of record for Batiste. On March 7, 1989, the new attorney, citing La.C.C.P. art. 2164 as authority, filed a motion to remand to the trial court for the introduction of the following evidence: (1) the October 28, 1987 deposition of Dr. Whi-tecloud; [3] (2) additional testimony from Batiste about her cervical and lumbar problems, her cervical discogram and her proposed cervical disc surgery; (3) records to show discograms are performed at OLOL; and (4) testimony and records showing Batiste’s cervical disc surgery on August 15, 1988.
It is implicit in Batiste’s motion for a remand that this court reverse the trial court’s judgment in favor of OLOL and remand for a new trial on the merits in the trial court.[4] Had Batiste applied for a new trial in the trial court pursuant to La.C.C.P. art. 1971 et seq., she would not have been entitled to that relief as a matter of right. Pursuant to La.C.C.P. art. 1972(2), a litigant only has a peremptory right to a new trial if he has discovered, since the trial, evidence important to the cause, which he could not, with due diligence, have obtained before or during the trial. Dr. Whitecloud’s October 28, 1987 deposition, Batiste’s additional testimony, and the OLOL discogram records were *1344 available and obtainable with due diligence before or during the trial on February 19, 1988. The evidence of Batiste’s cervical disc surgery on August 15, 1988, could not form the basis for a peremptory new trial in the trial court because La.C.C.P. art. 1972 only applies to evidence which existed at the time of trial. Thomas v. Hartford Insurance Company, 540 So.2d 1068 (La.App. 1st Cir.), writ denied, 542 So.2d 516 (La.1989).
However, Batiste requests we grant the remand and new trial pursuant to La.C.C.P. art. 2164,[5] which provides, in pertinent part, as follows:
The appellate court shall render any judgment which is just, legal, and proper upon the record on appeal.
Although an appellate court is empowered to remand a case for a new trial, such a procedure should be sparingly exercised; whether a particular case is remanded is a matter over which the court has much discretion and is governed by the particular facts and circumstances in each case. Jones v. LeDay, 378 So.2d 787 (La.App. 3rd Cir.1979). When a case has been thoroughly tried and lengthy evidence has been adduced from numerous witnesses, it is not proper to remand a case for the talcing of testimony which is essentially cumulative; the losing party in this situation has had ample opportunity to prepare and present his case. Steven v. Liberty Mutual Insurance Co., 509 So.2d 720 (La.App. 3rd Cir.1987). Ordinarily, a remand is not granted in a case simply for the purpose of introducing evidence which was known, or which by the exercise of reasonable diligence should have been known, to the losing party and was available to him. Williams v. New Orleans Paper Box Company, 185 So.2d 109 (La.App. 4th Cir.1966). Thus, the October 28, 1987 deposition of Dr. Whitecloud, the additional testimony of Batiste and the OLOL discogram records do not furnish a sufficient basis for granting a remand in this case because this evidence was known, or should have been known with the exercise of due diligence, to Batiste and her trial counsel and was available at the time of the trial.
Batiste also requests a remand based on the fact that she had cervical disc surgery on August 15, 1988. She has attached to her motion for remand a copy of records of the Charity Hospital of Louisiana at New Orleans which shows that on August 14, 1988, she was admitted to the hospital, on August 15, 1988, she had an anterior cervical spondylosis (fusion) performed on her C-5, C-6 disc with an iliac crest bone graft, and on August 18, 1988, she was released from the hospital.
The trial court found as fact that Batiste’s accident caused cervical and lumbar strains from which she recovered. These factual findings were based on the testimony of three neurosurgeons, a neurologist, an orthopedic surgeon, and a clinical psychologist, and the results of two hospitalizations for extensive diagnostic testing. There is authority in the jurisprudence for granting a remand for a new trial in a worker’s compensation case where an employee has surgery subsequent to a trial and that surgery could have relevance to the issue of whether or not the employee’s injury is compensable. See Crimen v. Fidelity and Casualty Company of New York, 249 La. 1071, 193 So.2d 249 (1966); Nini v. Volume Merchandise, Inc., 282 So.2d 748 (La.App. 1st Cir.1973). However, after considering all of the facts and circumstances of this case and the overwhelming evidence upon which the trial court’s judgment is based, we conclude that this case is not an appropriate candidate for a remand.
The motion to remand is denied.
*1345 DECREE
For the foregoing reasons, the judgment of the trial court is affirmed, and the motion to remand is denied. Appellant is cast for the cost of this appeal.
AFFIRMED; MOTION TO REMAND DENIED.

. This evidence was apparently introduced to impeach Batiste’s credibility. La.R.S. 15:495. See also La.C.E. art. 609, effective January 1, 1989.

. This synopsis of testimony comes from Dr. Whitecloud’s deposition of August 3, 1987. Dr. Whitecloud’s deposition of October 28, 1987, was not introduced into evidence at the trial and will be discussed later in this opinion.

. The October 28, 1987 deposition of Dr. Whitec-loud shows the following facts. Dr. Whitecloud saw Batiste on August 4, 1987, and had a discography performed on her cervical discs on September 4, 1987. This test revealed an abnormality at the C-5, C-6 level which was diagnosed as a cervical discogenic syndrome with an abnormal disc. This condition was related to the OLOL accident and was not caused by degenerative changes. Batiste had no objective symptoms in the cervical area, and this condition would not have shown up on the other diagnostic tests performed on Batiste.

. Pursuant to La.C.C.P. art. 2164, an appellate court must render its judgment upon the record on appeal. The record on appeal is that which is sent by the trial court to the appellate court and includes the pleadings, court minutes, transcript, jury instructions, judgments and other rulings, unless otherwise designated. La.C.C.P. arts. 2127 and 2128; Official Revision Comment (d) for La.C.C.P. art. 2127. An appellate court cannot review evidence that is not in the record on appeal and cannot receive new evidence. Davis v. Anderson, 451 So.2d 1302 (La.App. 1st Cir.1984). Thus, an appellate court cannot review facts in appellate briefs, affidavits and motions, if those facts are not in the record. Capital Drilling Company v. Graves, 496 So.2d 487 (La.App. 1st Cir.1986); Fred H. Moran Construction Corporation v. Elnaggar, 441 So.2d 260 (La.App. 1st Cir.1983); Bullock v. Commercial Union Insurance Company, 397 So.2d 13 (La.App. 3rd Cir.1981). Thus, to properly get these facts before an appellate court, the trial court’s judgment must be reversed, the case must be remanded to the trial court, the trial court must conduct a new trial at which the new facts are placed in the record, the trial court must render a new judgment, and there must be a new appeal.

. Remanding, pursuant to La.C.C.P. art. 2164, must be distinguished from modification of a judgment in a worker’s compensation case due to a change in the employee's physical condition, as provided for in La.R.S. 23:1331. Campbell v. Luke Construction Company, 465 So.2d 688 (La.1985); Schultz v. Katz and Besthoff, Inc., 499 So.2d 1243 (La.App. 4th Cir. 1986), writ denied, 501 So.2d 772 (La.1987); Matherne v. Gold Crest Cleaners, Inc., 486 So.2d 943 (La.App. 1st Cir.1986); W. Malone and H. Johnson, 13 Louisiana Civil Law Treatise, Workers’ Compensation Law and Practice, § 284, 658-661 (2d ed. 1980).